IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:15-CR-46-6H

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM &** |
| CHRISTOPHER SALOMON, | ) | **RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

This matter is before the court on Defendant's motion to suppress [DE #138] and supplemental motion to suppress [DE #187], which have been referred to the undersigned for memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Government filed a response in opposition to the motion to suppress. To further develop the record, the undersigned conducted an evidentiary hearing on November 17, 2015, at which the Government and Defendant, with counsel, appeared. Accordingly, the matter is now ripe for decision.

## STATEMENT OF THE CASE

On May 7, 2015, a federal grand jury returned a fifteen-count indictment against Christopher Salomon ("Salomon") and eight other individuals. Salomon is charged with the following three counts: (1) conspiracy to distribute and possession with the intent to distribute two-hundred and eighty grams or more of cocaine base (crack), in violation of 21 U.S.C. §§ 841(a) and 846 (count one); (2) distribution of a quantity of heroin and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) (count ten); and (3) possession with intent to distribute a quantity of heroin, in violation of 21 U.S.C. § 841(a)(1) (count fifteen).

On July 24, 2015, Salomon filed the instant motion to suppress, and on October 23, 2015, he filed a supplemental motion to suppress. Salomon contends that he did not knowingly,

voluntarily and intelligently waive his *Miranda* rights and that, therefore, statements Salomon made to law enforcement officers on April 1, 2015, and April 2, 2015, should be suppressed on the ground they were obtained in violation of his Fifth and Sixth Amendment rights. The government argues that there was no coercive government conduct and that Salomon knowingly, voluntarily and intelligently waived his *Miranda* rights.

## STATEMENT OF THE FACTS

At the evidentiary hearing on Salomon's motion, the court heard the testimony of the following individuals: Sergeant Gary Quick and Lieutenant John Raynor of the Craven County Sheriff's Department; Detective Kevin Doyle of the Jacksonville Police Department; Salomon's step-grandfather, William Lightsey; Salomon; and forensic psychologist, Dr. Amy James. Also admitted into evidence was an audio recording of Salomon's April 1, 2015, interview, a photograph, and documentary evidence. Based upon the testimony and the exhibits admitted into evidence, the undersigned makes the following findings of fact.

**I. Officers' Testimony**

On March 26, 2015, agents with the Coastal Narcotics Enforcement Team (CNET) were conducting surveillance on a known narcotics distribution location on Church Street in New Bern. Sergeant Quick and Lieutenant Raynor were part of the surveillance team. Officers had received information that a Toyota Camry may make a delivery of narcotics to the Church Street location. While watching the Church Street location, Sergeant Quick saw a van circle the premises and park next to Sergeant Quick's vehicle in a parking lot within site of the Church Street location. A short time later, a Toyota Camry pulled up to the Church Street location, and the van immediately returned to meet the Camry. A black male got out of the van and spoke with the driver of the Camry.

2

Upon the van leaving the premises, officers performed a traffic stop on the van. The driver was a female and the only passenger was Salomon. The female appeared nervous but complied with officers when they asked her to get out of the vehicle. Officers immediately separated the female and Salomon. Salomon explained that he had a prosthetic and he had lost his leg after being shot. After being asked why they were in New Bern, the female and Salomon gave different stories. Based on the differing stories, officers had a K-9 unit conduct a dog sniff of the vehicle. Because Salomon said he was from Jacksonville, North Carolina, Sergeant Quick called Detective Doyle in Jacksonville to see if he was familiar with Salomon. Detective Doyle indicated that he routinely encountered Salomon.

During the search of the vehicle, both the female and Salomon denied that there were narcotics in the vehicle. Salomon asked the officers whether he would be allowed to go home if no contraband were found on his person. Based on this comment, Sergeant Quick made another phone call to Detective Doyle to see if Salomon had used females to hide narcotics for him in the past. Detective Doyle indicated that he had. Sergeant Quick then asked the female if she was hiding narcotics in her vagina. She indicated she was but stated they were Salomon's and not hers. The female also stated that she had been to New Bern with Salomon on more than one occasion. Both the female and Salomon were transported to the sheriff's department for interviews, and the narcotics were recovered from the female.

Officers first attempted to interview Salomon on the day of his arrest, March 26, 2015. Salomon was read and invoked his *Miranda* rights, refusing to speak to the officers. When taken in front of the magistrate, however, Salomon made an unsolicited statement to Lieutenant Raynor that the drugs were his and that he did not want his girlfriend to be arrested. Lieutenant Raynor

3

responded that there was nothing he could do and that Salomon would have to speak to the judge at his initial appearance.

A few days later, Sergeant Quick received word that Salomon wanted to talk to officers. On April 1, 2015, Sergeant Quick and Lieutenant Raynor met with Salomon in a large conference room at the Craven County Sheriff's Office. Two other law enforcement officers were also present. Lieutenant Raynor read Salomon his *Miranda* rights, and Salomon signed the waiver form. Officers were aware Salomon had been appointed an attorney, but neither the officers nor Salomon knew the name of his attorney. Because Salomon had requested to speak with law enforcement, they did not contact his attorney. Officers did not threaten Salomon or make promises in order to obtain a waiver. There is an audio recording of the interview in which a bond reduction is discussed, but no promise of a bond reduction is made. (Government's Ex. 3.)

Because Salomon was cooperating, the officers wanted to make him comfortable. Bathroom breaks were made available, and Salomon was offered a soda. The interview lasted about an hour. Salomon did not complain of any pain or discomfort. He did not make complaints of medical issues regarding his leg or his prosthetic. Moreover, he did not mention that he had been placed in solitary confinement or apart from the general population of the Craven County Jail. Neither Sergeant Quick nor Lieutenant Raynor had questions concerning Salomon's waiver of his rights or whether he understood his rights. Salomon was cooperative during the interview and was easily understood by the officers.

Salomon repeatedly expressed that he wanted his bond reduced and wanted to get his girlfriend out of jail. Salomon then provided information that was corroborated and potentially useful to law enforcement officers. Most of Salomon's information pertained to Jacksonville and Onslow County, so Sergeant Quick contacted Detective Doyle to interview Salomon.

On April 2, 2015, Detective Doyle and Detective Keller with the Jacksonville Police Department interviewed Salomon in the same conference room at the Craven County Sheriff's Office. Two other Jacksonville police officers were present for training purposes. Craven County also had four officers present.

Detective Doyle was familiar with Salomon and had arrested him half a dozen times. Detective Doyle had never had difficulty communicating with Salomon on prior occasions. At the April 2 interview, Detective Keller conducted the *Miranda* warnings, addressing each right individually. At no point did Salomon indicate that he did not understand, and Detective Doyle had no concerns with Salomon's comprehension. After Detective Keller finished reading Salomon his rights, Salomon signed the *Miranda* waiver.

Because of the information provided at the interviews, officers considered using Salomon as a confidential informant. Detective Doyle contacted the district attorney in Jacksonville to inquire about the possibility but never received a call back. Detective Doyle further testified that if Salomon had not waived his *Miranda* rights, he would not have explored this possibility.

Detective Doyle was the primary questioner during the second interview. Salomon was offered a soda during the interview, and he never complained of pain. Moreover, Salomon's statements regarding his leg were focused on the circumstances surrounding the loss of his leg, but he did not express any current discomfort or concerns about his prosthesis. He did not express difficulties with being housed in a holding cell. There was no indication that law enforcement officers threatened Salomon or made him promises in order to get him to waive his *Miranda* rights on April 2, 2015.

## II. William Lightsey

Mr. Lightsey, Salomon's step-grandfather, lives in Jacksonville, North Carolina and has been married to Salomon's grandmother for two years. He has known Salomon for approximately four years. Salomon lived with them after having his leg amputated. Mr. Lightsey worked with the school system for fourteen years and was in the Marine Corps for thirty years.

While in the Craven County Jail, Salomon wrote letters and made phone calls to his grandmother and Mr. Lightsey. Salomon asked them to provide the bond and stated that he would do anything to get out of jail. Mr. Lightsey testified that Salomon attended school until about the seventh or eighth grade. Mr. Lightsey noted that, after having his leg amputated, Salomon had trouble understanding doctor's instructions, procedures regarding payment of medical bills, and letters describing his disability status. Mr. Lightsey stated, "[Salomon] is street smart. Not educationally smart." Salomon has worked various manual labor positions and at some restaurants washing dishes prior to his leg being amputated. Mr. Lightsey does not recall any of the jobs lasting more than six months.

## III. Christopher Salomon

Salomon also testified at the hearing. He acknowledged that he wrote several letters while detained in the Craven County Jail because he wanted to get out of jail. After his initial appearance at which he was appointed an attorney, Salomon requested to speak with the Craven County officials. He was interviewed a few days later. As of the first interview, Salomon had not seen or spoken with his lawyer.

Because of his prosthesis, Salomon was not put in general population but was instead kept in a holding cell for about a month after his arrest. Salomon stated that the lights in the holding cell were never turned off, he was given a mat on the floor on which to sleep, he did not receive

6

pain medication that he regularly takes for his amputated leg, and throughout all hours of the day people that had been arrested would rotate in and out of the holding cell. Additionally, Salomon explained that while in jail he was worried about his girlfriend and stressed about who was caring for her three small children.

In the past, Salomon had been arrested and read his *Miranda* rights. Because he had been arrested before, Salomon knew he did not have to speak with officers. Ironically, at the time of his arrest, Salomon was wearing a shirt that read "Plead the 5th. Keep your mouth shut." When Salomon went in front of the magistrate, he admitted that the drugs were his. Although he had been appointed an attorney, Salomon decided shortly after his initial appearance that he wanted to speak with law enforcement officers and requested that the jailers tell law enforcement he wanted to talk. Salomon reported that an officer told him he could help himself by speaking to law enforcement officers.

Salomon was familiar with Detectives Doyle and Keller, but he had never met the Craven County deputies before his arrest on March 26, 2015. Salomon stated that he signed the *Miranda* waiver on April 1, 2015, but he didn't know what the *Miranda* waiver form was. When questioned concerning knowledge of his Fifth and Sixth Amendment rights at the hearing, Salomon testified that a few years ago he pled guilty and served eighteen months for conspiracy to commit robbery and burglary. However, he said his attorney did not go over his rights with him and that he saw his attorney only once. Salomon also testified that after Lieutenant Raynor read him his rights at the April 1, 2015, interview, Salomon understood his right to remain silent and the right to have an attorney present. While Salomon testified he did not understand that information he provided could be used against him, the court does not find Salomon's testimony in this regard to be credible.

At the interviews, Salomon explained that he told officers about people in New Bern and Jacksonville. He did not complain about not getting medications, where he was being held, being uncomfortable, or that he was concerned about his girlfriend's children. Salomon further testified that officers promised that if he cooperated he would get out of jail, but the officers did not assault him or threated him, his girlfriend, or his girlfriend's children. Salomon reported that officers told him that if he did not speak with them that they were not going to help him get out of jail. At the hearing, Salomon stated that he now understood his rights but that he did not at the time of the April 1 and 2, 2015, interviews.

## IV. Dr. Amy James

Dr. James was retained to evaluate Salomon's ability to understand and his ability to knowingly and intelligently waive his Fifth and Sixth Amendment rights. She administered the WAIS-IV to determine his intellectual functioning. Salomon's full scale IQ was 78. With a standard error of measurement, there is a 95% chance that Salomon's true score falls between 74 and 83. Salomon's verbal score was in the low-average range, and his non-verbal decision-making skills tested in the low-average range. His working memory was 80. His processing speed, based on gathering information processing and making an accurate decision, was 71, which is considered borderline.

Dr. James testified that the intelligence level of a person affects decision-making capabilities, and people with lower IQs exhibit a larger negative impact on decision-making capabilities in a stressful situation. Such a person will more likely make decisions quickly, without weighing all potential benefits and risks. As the stress increases, the likelihood increases that the individual will engage in self-defeating behavior merely to eliminate the stressor. As a consequence, the individual may decide to engage in conduct to make a stressor go away without

considering the long-term impact of the decision. As IQ increases, the likelihood that stress affects decision-making capabilities decreases to the same degree.

During her evaluation of Salomon, Salomon listed several factors he considered to be stressful: (1) he was in a holding cell for forty-seven hours and then in the general population for one hour, at which time he would shower; (2) he did not receive adequate medical care; and (3) he was concerned about his girlfriend and her three children. Dr. James learned of other stress factors at the hearing which were not addressed at the evaluation: (1) Salomon did not receive prescribed medication for pain; (2) he was sleeping on a mat on the floor of the holding cell; and (3) the lights were on twenty-four hours a day in the holding cell.

Based upon her evaluation, Dr. James opined that "[i]t is possible, it's at least as likely as not or a fifty-fifty chance, that his relinquishment of his rights was voluntary due to potential concerns for deception." She based this opinion on her determination that Salomon was operating under belief that if he cooperated, he would get to go home. Dr. James also opined that it was "probable, meaning more likely than not, that [Salomon] is more vulnerable to deception than a defendant with average health status, average intellectual functioning . . . who had been placed in the general detainee population." She explained that Salomon was more likely to decide that relinquishing his rights would benefit him without gauging the long-term consequences of that action.

Regarding Salomon's awareness of the full nature of his rights, Dr. James stated it was "probable that his ability to fully understand and appreciate the consequences of waiving his right was mildly to moderately impaired due to cognitive or intellectual functioning." She based this opinion on Salomon's low intellectual functioning and the presence of the following risk factors: physical pain, emotional distress, and the number of officers present at interview. Dr. James

9

explained that if more than six officers are present for an interview, it is more likely that the person being interrogated would be susceptible to deception. Dr. James' opinions are further premised upon the proposition that Salomon believed information provided during the interview would not be used against him in a court of law. Dr. James clarified that she was not saying deception or coercion occurred in the present case, but she expressed concern with the possibility that Salomon was told he could get his bond reduced if he spoke with the officers.

Dr. James also reviewed Salomon's school records from 1994 and 1997, a psychological evaluation conducted in 1997, a focus-of-concern screening from 1993, letters believed to be written by Salomon to his grandparents, and letters written by Salomon to judges or attorneys. Additionally, Dr. James used the waiver signed on April 2, 2015, and had Salomon read it line-by-line, explaining the meaning of each line. Dr. James' opinion was that overall Salomon had a basic understanding of his Fifth and Sixth Amendment rights. Dr. James' worry was not that Salomon did not understand his rights; it was that his will was overborne by the other factors present.

## DISCUSSION

The Fifth Amendment guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In order to protect one's Fifth Amendment right, prior to a custodial interrogation, a suspect must be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. *Id.*

"[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings," including interrogations by law enforcement. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). A defendant may waive his Sixth Amendment right to counsel "whether or not he is already represented by counsel," and "the decision to waive need not itself be counseled." *Id.* Generally, a defendant waives his Sixth Amendment right to counsel if he is read his *Miranda* rights, and he agrees to waive them. *Id.* A defendant's waiver of his Sixth Amendment right to counsel "will be evaluated under the same analysis as are waivers of the Fifth Amendment right under *Miranda*." *Poyner v. Murray*, 964 F.2d 1404, 1414 n.5 (4th Cir. 1992).

Once a defendant invokes his right to counsel, "additional safeguards are necessary" before a custodial interrogation may occur. *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). To determine whether a defendant's statement is admissible, a court must make two inquiries: (1) whether the defendant initiated contact with law enforcement that led to further interrogation; and (2) "whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-46 (1983) (quoting *Edwards*, 451 U.S. at 486, n.9)).

Even when the defendant initiates contact with law enforcement, the prosecution has the burden to show by a preponderance of the evidence that the defendant waived his Fifth Amendment right to have counsel present. *Bradshaw*, 462 U.S. at 1044. A waiver of a defendant's Fifth and Sixth Amendment rights must be made "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444. "A statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997). "In considering whether a defendant's waiver is voluntary, the Court

must determine whether the confession was extracted by any sort of threats of violence, obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012). The test for determining whether a waiver is voluntary "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *United States v. Holmes*, 670 F.3d 856, 591 (4th Cir. 2012). In order for a court to find that a waiver was involuntary under the Due Process Clause, there must be "coercive police activity." *Braxton*, 112 F.3d at 780.

Here, Salomon admits to initiating contact with officers after having invoked his *Miranda* rights on March 26, 2015. Additionally, no evidence was presented to suggest that the interviewing officers at either the April 1, 2015, interview or the April 2, 2015, interview made threats in order to coerce Salomon into waiving his Fifth and Sixth Amendment rights. The evidence being controverted as to any promises to get Salomon's bond reduced, the court must make a factual finding as to whether any such promise was made. In doing so, the court must assess the credibility of the witnesses, considering such factors as the variations in their demeanor and tone of voice, as well as the witnesses' motives, the level of detail in their testimony and the existence or lack thereof of any documents or objective evidence corroborating or contradicting the testimony. *Rahman v. United States*, No. 7:08-CR-126-D, 2013 WL 5222160, at *5 (E.D.N.C. Aug. 27, 2013).

Having carefully considered all of the evidence presented in this matter, the court determines that the testimony provided by Sergeant Quick, Lieutenant Raynor, and Detective Doyle is more credible than Salomon's. Based upon the evidence presented, the undersigned finds, as a fact, that the officers did not promise Salomon a bond reduction if he provided information. In making this finding, the undersigned notes that in the recording of the April 1, 2015, interview, Lieutenant Raynor expressly informed Salomon that it was his attorney's responsibility to handle

a bond reduction. Neither Sergeant Quick nor Lieutenant Raynor made any other promises during the first interview. Furthermore, the officers have only a professional interest in the outcome of the case, do not appear to have any bias or prejudice against Salomon, and all three officers' testimony was consistent regarding the two interviews.

At most, the evidence presented demonstrates that Salomon would merely be more susceptible to coercion than his peers. The evidence shows that Salomon had been Mirandized for arrests in the past; he was Mirandized the day of his arrest and chose to invoke his Fifth and Sixth Amendment rights; and he was read his rights at each interview and signed two *Miranda* waiver forms. The interviewing officers indicated that Salomon appeared to understand his rights, and they had no reservations about his ability to waive his rights. Moreover, officers were unaware of Salomon's conditions of confinement and Salomon did not make any complaints to them. During the interviews, Salomon was offered beverages and allowed access to the restroom facilities. The interviews were conducted in a spacious conference room, and each interview lasted no more than an hour.

While Dr. James' opinion indicates Salomon is more susceptible to coercion, there is no evidence that his will was overborne by coercive police activity. Additionally, Dr. James purports that Salomon understands his Fifth and Sixth Amendment rights. Considering the totality of the circumstances, including Salomon's characteristics, the setting of the interviews and the officers' actions in interrogating Salomon, the undersigned determines that Salomon's will was not overborne by the officers' actions and that the *Miranda* waivers he signed on April 1 and April 2, 2015, were voluntarily, knowingly, and intelligently made.

13

Case 7:15-cr-00046-H   Document 230   Filed 03/01/16   Page 13 of 14

## **CONCLUSION**

For the foregoing reasons, the undersigned RECOMMENDS that Defendant's Motion to Suppress [DE #138] and Supplemental Motion to Suppress [DE #187] be DENIED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **March 18, 2016**, to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.,* 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

A party that does not file written objections to the Memorandum and Recommendation by the foregoing deadline, will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, a party's failure to file written objections by the foregoing deadline may bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

This 1st day of March 2016.

                                              KIMBERLY A. SWANK
                                              United States Magistrate Judge